UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v.                            ) | CRIMINAL NO. 15-cr-10322 |
| ) | |
| SHANE GUNN,           ) | |
| Defendant            ) | |

## Government's Sentencing Memorandum

**Introduction**

In late 2009 or early 2010, Shane Gunn proposed to a group of doctors at Pentucket Medical Associates (PMA) in Massachusetts that he design, program, patent and market a software system which would enable computer systems at diverse medical practices to share patient information effectively. With the support of doctors and others, he incorporated CareXGen for this purpose in February, 2010. In return for engineering the health information exchange system and all the patent rights in it, Gunn was given a quarter of the new company's authorized shares of stock.

Unknown to the doctors, Gunn had two prior convictions for theft. Most notably, during Gunn's second series of thefts, he repeatedly misrepresented to his employer that a company had agreed to purchase computer equipment which he, in fact, had simply stolen. (Presentence Investigation Report at ¶ 44). Similarly, Gunn repeatedly misrepresented to the doctors that companies had agreed to larger and larger contracts to use and ultimately buy CareXGen's system, and Gunn simply stole nearly all of the money they invested. While Gunn encouraged investors to believe the money they were investing was necessary both for hiring programmers and lawyers and for additional patenting and marketing of the software system, he was, in fact,

pocketing CareXGen's money literally as fast as it came in. Ultimately, when CareXGen's bank accounts went dry in the latter half of 2011 and the first half of 2012, he marketed his own CareXGen stock to investors and their families, buoying the price with the exciting details of the biggest deal yet, the fictional imminent sale of the company for hundreds of millions of dollars to Intel to which Gunn has confessed.

### The Purpose of the Evidentiary Hearing at Sentencing

Resolving two interrelated, factual issues necessitate the evidentiary hearing at sentencing:

(1) Whose rights, as victims, should be recognized by the Court; and

(2) Within what range was the dollar loss attributable to the defendant's course of criminal conduct for the purpose of determining the advisory U.S. Sentencing Guideline range.

Gunn has admitted that beginning in May 2012 he misrepresented to investors that Intel wanted to buy CareXGen for hundreds of millions of dollars. As Gunn sold his own stock to victims, he graphically described the nonexistent negotiations, even his review of the contract.

Gunn described this as a one-time, "breathtakingly wrong" mistake. If the court finds that Gunn sought to defraud investors earlier, or to embezzle their funds, then these victims will have rights to restitution as well. The Court does not have to determine the precise instant at which Gunn decided to embezzle CareXGen's funds or defraud investors – at the hearing the government will establish by a preponderance of the evidence that Gunn was criminally siphoning off money being invested in CareXGen by early April, 2010. If the court finds by a preponderance of the evidence that even a quarter of the investments between March 25, 2010

and February 24, 2011 were obtained by fraud or that Gunn embezzled even $400,000 of the over $1.3 million of CareXGen's money that he pocketed, spent and transferred to his girlfriend and ex-wife between March 2010 and February 2011, then the advisory U.S. Sentencing Guideline range is twenty-four, as correctly determined by the US Probation Officer analyzing the case.

**The Court Should Recognize All of the Investors in CareXGen Were Victimized by Gunn**

Gunn concedes, as he must, that the "Intel deal" with which he lured $1.1 million additional dollars of investment in CareXGen beginning in May 2012 was a complete fabrication. (Intel would testify that it has never heard of Gunn.) Gunn contends, however, that it was a spontaneous and complete aberration – that up to that moment he was completely honest and forthright with investors and with the money they entrusted to CareXGen. The sentencing hearing will establish by a preponderance of the evidence that this theft of investors' money was neither spontaneous nor an aberration. Accordingly, the Court should recognize the victim rights of all of the investors in CareXGen to restitution and find the loss attributable to Gunn's criminal conduct is more than $1,500,000 (but not more than $3,500,000) as calculated in the Presentence Investigation Report.

**Gunn Took Over a Million Dollars From CareXGen During Its First Six Months of Existence**

In the six months between March and September 2010, when doctors and their families were encouraged to initially invest in CareXGen, bank records will demonstrate that Gunn, by any accounting, siphoned over $1 million of investors' money in CareXGen, spending it on cars, a boat, a shopping trip to Rodeo Drive, women's and men's high-end clothing, construction payments for a house and transfers to his ex-wife, among other things. Gunn tries to characterize

this as salary. However, tax records from his accountant reflect that he reported receiving less than $46,000 from wages and business income during all of 2010. And, he earned less than $20,000 a month the previous year, according to his accountant's tax records.

**From the Outset Gunn Intentionally Misled Investors Into Believing Their Investments Were For Product Development, And Instead Quickly Pocketed Their Money**

The pattern of investor fraud which would culminate in Gunn fabricating the imminent sale of CareXGen to Intel was already entrenched in April 2010, when he was soliciting doctors to invest hundreds of thousands of dollars apiece in the company. Gunn intentionally led investors to believe that their money was going to be used to build a research and development team to deliver marketable software products, when he was, in fact, immediately putting the money they paid for CareXGen stock into his own pocket. For example, while encouraging one doctor to invest $250,000 in CareXGen, he e-mailed on April 13, 2010:

> Stock is the best way to get involved until we get the R&D plans laid out. The 2nd and 3rd Patents are going to be assigned to CareXGen as well we will need money as well for servers and developer salaries to get them to production. (sic)

Attorney Mike Batson will testify that he participated in a review of CareXGen's books and records after Gunn was fired by the company and he found no evidence that an "R&D team" had ever been hired by Gunn, that salaries had ever been paid to developers, or, despite repeated requests of Gunn, that any software product whatsoever had ever been created. Bank account records will demonstrate that Gunn, instead, transferred over $228,000 of the doctor's $250,000 investment to accounts controlled by him, his girlfriend and family members within a matter of days.

Just as he did later with the "Intel deal," Gunn hustled investors, intentionally misrepresenting to them that there was an imminent sale of CareXGen for billions that they would lose out on if they did not buy stock immediately. Doctor Sunny Srivastava will testify that immediately before he and his family invested approximately $120,000 in CareXGen on May 12, 2010, Gunn told him that a company named eClinical Works was seriously interested in acquiring CareXGen for billions. As with the later "Intel deal," there is no evidence that eClinical Works was ever interested in buying CareXGen. And, as with his fellow doctor's investment, bank records will demonstrate Gunn immediately transferring $100,000 of the family's $100,000 investment from CareXGen's bank accounts to ones controlled by him, his girlfriend and his ex-wife, and used as a house payment.

**To Lull Early Investors Into Investing More And Encourage New Investors, Gunn Early On Falsely Represented That CareXGen Had Contracts Worth Millions of Dollars in Place**

Within months, Gunn was telling people CareXGen had contracts worth millions of dollars. In a contemporaneous e-mail, Sunny Srivastava summarized Gunn's false representations:

> –Three customers are lined up thus far. The Southeast PHO contract looks to be $1.5 million per year for three – five years. A meeting is coming up next week. There is a Curaspan contract that will start at the end of the year valued at $3 million for eighteen months the Amazon/Wanova contract is $12 million per year for 3 to 5 years.

Investors money, accordingly, continued to flow into CareXGen and from CareXGen quickly into Gunn's pocket. On September 10, 2010, Dr. Srivastava and two others invested a total of $220,000 more into CareXGen. Within a matter of days, bank records reflect Gunn taking over $186,000 of CareXGen's funds to purchase men's and women's clothing, travel, entertainment; to make a $100,000 personal house payment; and to fund accounts controlled by him, his

girlfriend and family members. Attorney Mike Batson will testify that the review conducted by the Board of Directors of CareXGen after Gunn was removed found no evidence of these contracts ever having existed, just as it found no evidence that developers were ever retained to build the software products for CareXGen these companies might want to buy.

## Conclusion

Shane Gunn did not suddenly and spontaneously begin defrauding investors in CareXGen in May 2012.  He took advantage of the faith they put in him from as early as April, 2010, pocketing the money invested in CareXGen, sending it to his girlfriend, ex-wife and family members, spending it extravagantly on men's and women's clothes and cars.  He lured their investments with knowingly false descriptions of how the money would be used to develop marketable software products and flagrantly false descriptions of how CareXGen's in-fact non-existent software was generating millions of dollars in ongoing sales.

The Court should recognize the victim rights of all of those who were lured into Gunn's fraud and with whose moneys he criminally walked away.  While there was a legitimate recognized need for sharing medical records among practices, Gunn did not put investors' money towards developing the software that would satisfy this need or give CareXGen's sole patent any value.  Rather, he took advantage of investors from the outset, drawing money in to exploit for his own personal gain and purposes.

        Carmen M. Ortiz
        U.S. Attorney

        */s/ Stephen P. Heymann*
By:   Stephen P. Heymann
        Assistant U.S. Attorney

## CERTIFICATE OF SERVICE

I, Stephen P. Heymann, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on March 28, 2016.

        */s/ Stephen P. Heymann*
        Stephen P. Heymann